Inc. Oral argument not to exceed 15 minutes for plaintiff, 15 minutes to be shared by defendants. Daniel W. Dreyfuss for the appellant. Case number 14-3437 Children's Hospital Medical Center of Akron v. Youngstown Associates in Radiology Inc. Oral argument not to exceed 15 minutes for plaintiff, 15 minutes to be shared by defendants. Thank you, your honors. My name is Daniel Dreyfuss. Initially I'd like to reserve three minutes for rebuttal. You may. Thank you. May it please the court, I represent the Children's Hospital Medical Center of Akron. The plan's refusal to cover a child's life-saving chemotherapy treatment was the result of an improper and illegal interpretation of the terms of his mother's insurance policy. This court should reverse the decision of the district court and remand for further proceedings for two reasons. First, the plan decision was substantially affected by conflict of interest. Second, the hospital's appeal failed to follow proper procedures and failed to consider evidence that made the denial arbitrary and capricious as a matter of law. Reviewing the entire administrative record, the only piece of evidence cited by appellees in support of the denial of these benefits was a consent form signed by the decide because the plan, TPA, withheld expert opinions that were needed under plan guidelines. I'm sorry, when you say TPA? I'm sorry, third party administrator, PRM, also an appellee. Okay, but they are the claims administrator. YAIR is the plan administrator. Isn't that right? Correct. Okay. Whether the consent form was sufficient at the point of the initial denial, the continued denial based upon the informed consent did not meet So we can have a discussion here. Would you agree that the question is, this relates to this provision, I mean, on the merits before us now, not about the assignment and so on, but this provision in the contractual document that says that expenses for drugs, et cetera, related to experimental or investigational treatment and if you read that broadly to mean any kind of connection with the environmental, excuse me, the experimental trial, then you would say that this is not covered, but if you read related to, to mean more narrowly to exactly the pill that was being given, then you would have a different outcome. Do you follow me? I do, your honor, and arguably that could be the case. However, You don't think that's the question? That is one of the questions, but once an appeal was filed, the appeal had to be considered under administrative record section or page 148, which is titled reviews of initially denied claims. And under that provision, any review involving experimental denials requires that the matter be submitted to a health care professional with appropriate training and experience. In fact, PRM requested... PRM? Don't talk in acronyms. I'm sorry. Apply the... Professional risk management. Professional risk management. Thank you, your honor. Ordered two expert medical opinions. One of them was supplied on December 9, 2009, and it was provided by a pediatric oncologist. That expert medical opinion indicated that the treatment was standard of care and not experimental. So that would have found that under administrative record 113, the provision that you cited, that it was not experimental and should not be denied. Some of the cost was experimental. Only the cost of the actual experimental drug. Read the words related to it in a narrow sense to focus directly on that. And then who did that report go to and who decided on it? That report was supplied to professional risk management. However, there is no indication in the administrative record that it was ever supplied to the plan. Further, once the plan issued a decision on the appeal filed by Children's Hospital, which appears at administrative record... I'm sorry, 29 through 33. The problem is that the plan... Judy Miles, to talk in terms of who was actually operating, working here, she didn't take into account evidence from this doctor about what was at stake. No, she did not, your honor. In fact, it was never provided to her. And if you review the... She made a mistake in her decision based upon that failure to take that into account. Correct. It violated the review provision at administrative record 148. And in fact, in the decision that was sent to the hospital's attorneys, it specifically stated that the basis for the decision was section 113, solely the contractual language of experimental. It does not mention that an expert opinion was ever obtained or considered. Secondarily, there was a second opinion that was obtained from another medical expert who was a family physician. Both of those expert opinions appear at administrative record 50 to 52. The second expert opinion from the family physician, who is arguably less qualified and possibly unqualified, stated that the treatment was also standard of care, but that the use of the drug Gemtuzumab, the drug at issue here, was experimental. However, a second opinion was obtained from that same family physician. It appears at administrative record 333. That opinion that was rendered on February 25, 2010, indicates the treatment was standard of care and the use of the drug Gemtuzumab was not experimental. So these two opinions from the same family doctor, who do you say they went to? All of the opinions, as best we can determine, were delivered to professional risk management, but never delivered to the plant. And what's your basis for saying that they were never delivered to the plant? Does Judy Miles say that? Or is there not a paper trail? Or what's your basis for it? There is no paper trail in the administrative record, Your Honor. Was Judy Miles asked whether she ever saw them? Not by us. Okay. But your basis here is really a negative inference because they weren't referenced by the appeal denial? The trial court also determined that the expert medical opinions were not considered, I believe. I may be mistaken on that point. All right. We can look it up. Go ahead. Furthermore, Judy Miles, who issued the initial denial of benefits, who, excuse me, authorized the initial denial of benefits, which appears at administrative record 1605 through 1607 and 1631, initially wanted to approve these claims, but only agreed to reject the claims after she was told that the plant, and not the plant's stop-loss carrier, would be paying these claims. Notably, in the appeal... Is there a statement that they would not pay them, or simply that they would follow the rules under the plan? The statement was to the effect that the stop-loss carrier would, I think it was more likely, would not pay the claims. There's a whole series of e-mails. The one that I've been looking at basically says, you know, we'll follow the plan. Is there a particular one that you rely on for your side of it? If I might, I will try to find that for you. There's a lot of documents here, but at least I read it that it's somewhat over-interpreting to say we won't pay. So I wanted to see what your best evidence was. Okay. More notably, Your Honor, in the decision denying the hospital's appeal, it was also... I'm sorry. Prior to that decision being delivered to the hospital, it was also sent to Judy Miles, and that appears at Administrative Record 41 to 42, with a request that the plan approve that decision. When the decision was mailed to the hospital, or the hospital's attorney at Administrative Record 29 to 33, there is a statement in that decision to the effect that the person authorizing this decision had no input at the initial denial. That was incorrect. When you say the person authorizing the denial, is that Judy Miles again? Arguably, Judy Miles was the only person, only representative of the plan, who is identified in the Administrative Record as having received or corresponded. Okay. Thank you. She was the decision maker in a sense, but she got this advice from the other woman. What's her name? Tanya. Tanya, I believe, was an employee of either Professional Risk Management or Maritain, the owner of Professional Risk Management. Okay. All right. Thank you. You'll have your time for rebuttal. Thank you, Your Honor. Stephanie Turney. This is the woman's name. Good morning, and may it please the Court. My name is Matthew Van Such, and it is an honor to be here today representing Youngstown Associates in Radiology and its welfare plan. Sitting next to me at the table is Mr. Craig Carlson. He represents Professional Risk Management. We believe that Children's Hospital has abandoned its claims against PRM, so unless you have any specific questions directed towards them, I will be taking the 15 minutes of the appellee's time. The District Court's decision here should be affirmed for two primary reasons. First, because the plan prohibits a participant or beneficiary from assigning his or her rights under the plan to a third party like Children's Hospital, the parent's August 19, 2010, assignment of their insurance appeal rights to Children's Hospital is not effective as against the plan. Is there any kind of time problem? That is, if we were to agree with you on that, that would keep the parents then from litigating? A time problem, I don't believe. In other words, statute of limitations sort of thing. I'm not aware of any statute of limitations issue. But at this point, I believe Children's Hospital would have to relinquish those rights back to the parents for them to be able to assert that. And, again, that gets into questions. When Children's Hospital has, quote, gotten these rights, does that assignment indicate that they can't go against the parents? That is, is this really a fight only between the hospital and the plan, or are the parents on the hook for this $250,000? Your Honor, I do not know whether the parents are ultimately on the hook for the $250,000. Do we have a copy of the assignment? We have a copy of the assignment. Does it hold the parents harmless, or has that been raised? I don't know that it's been raised, Your Honor. Okay, go ahead. I apologize. I think we can ask. The second reason for that is that, and, therefore, Children's Hospital would not have standing under ERISA to bring the claims. The second reason is that the record as a whole supports a reason explanation. Let me break back in. When you said they would have to assign them back, but if the assignment's invalid, why couldn't the parents ask for the benefits? Your Honor, I'm not sure. I hadn't thought that far ahead. The record as a whole supports the reasoned explanation for the plan administrator's decision that the treatment that was covered, that was not covered under the plan because it was encompassed by the experimental exclusion. And this is so even. Let me ask you how you deal with this. There is Miles, the plan administrator. I think it writes an e-mail. It is Judy Miles writes an e-mail to Stephanie Turney. Yes. And in that e-mail, she says, it seems, it still seems blatantly unfair, however, to deny coverage for anything that is associated with the regular protocol for treating this leukemia. Someone other than myself is reading the plan document and will give us an expert opinion on the matter. But her initial belief apparently was that it was unfair to deny coverage entirely for this whole chemotherapy treatment. Yes, that's correct, Your Honor. And I think that goes to your initial question to Appellant, and that was, does this relate to just the pill or does it relate to all of the treatment? Because after, I believe it was after December 2009, the child was taken out of the clinical trial and the plan did cover everything that was the same. And it should be acknowledged that the treatment was the same except for the experimental arm. And the experimental arm is what disqualified that coverage under the exclusion. Judy Miles did go, and I believe that there was an e-mail from counsel that went and interpreted the plan to Judy saying, look, we also looked at the plan and we agree with PRM's direction as to where you should be going, that this should be excluded. That's from a law firm. I saw it here, HHM. That would be our law firm, Your Honor. That is you? Okay, sir. That would be Attorney Blomstrom. Your law firm gave them the advice they didn't have to pay. Correct, Your Honor, yes. We believe that this is still a reasoned decision despite there being the conflict of interest, which everyone acknowledges. But when we go back and look at what the Supreme Court has said in Glenn as to how you should be interpreting and looking at the various factors for whether the conflict of interest is so great that it might overcome the plain language of the plan. The plain language of the plan is not plain to me. Okay. You may have given them that advice, but, I mean, it really is how you're going to this language relate to, how you're going to interpret that, broadly or narrowly. Your Honor, it should be related to, should be anything relating to that treatment. That's the language. You can interpret it either broadly or narrowly, right? Your Honor, I don't know that you could separate the administration of the jantuzumab, I apologize for the pronunciation, which is an intravenous drug. It's not a pill. It's not a pill that one could say, here, we're going to give this, and that there are associated treatments that have to go along with that. You just don't go in and one day receive a pill, and then the next day you come back for something else. It's a course of treatment of which was covered, and apparently a standard of care. But what they were trying to do, and as even Dr. Civelli notes, that what they were trying to figure out in this experimental phase three clinical trial was that, what kind of doses should we give? Does this work?  What exactly was involved in connection with the clinical trial other than the administration of the pill? What were all of the factors that you say were involved in that that could affect this payment? Your Honor, I'm not as familiar with that medical treatment or as course as possible. I know there was $250,000 worth of associated treatments, and I believe that there was a hospital stay involved with it. He had a few hospital stays as well. How much of the cost was related directly to the clinical trial in the sense of the administration of the pill? Your Honor, I don't know the answer to that question. You're saying it's not a pill, it's an intravenous treatment. I hate to say they plop it down on top of what they normally do with the chemotherapy, but they added this into the chemotherapy, and I don't think there's any question that the child was part of the experimental arm of this. The phase three divided the participants into two arms, arm A and arm B. The administration of the drug, you're saying, was over a long period of time or just once? Your Honor, I don't know whether it was one time or whether it was just once. It was my impression that it was administered just once. But medically, that still may be part of the whole course of how they look at the chemotherapy and whether that was successful or not. It might affect the other. Whether it's good or bad practice, the plan says that you're not going to cover things, even if they would have been covered in the absence of the experimental treatment. That is correct. It may be pretty harsh, but that's really what you're relying on even more than how broad or how narrow is the fact that you contemplate that you're going to knock out stuff that you would otherwise do. That is correct, Your Honor, and that is what happened after the child was removed from the clinical trial, that they did everything the same except for the administration of this additional drug that I can't pronounce particularly well. But if we look at the plan itself, and I'd like to bring this point up, that in the briefing the appellant never really addresses the guidance that's part of that whole definition of experimental except to say that the plan should never have looked at the guidance sections because the first paragraph is so plain and clear that it definitely covers this. When, in fact, that first paragraph, the last words of it are, shall, as determined by the plan administrator, as set forth below. And so we then look at the four guiding principles that the plan is supposed to look at. The second one is that the informed consent document utilized with the drug was reviewed and approved by the treating facility's institutional review board. That applies in this case. Then it is deemed to be experimental or investigational. Three, if reliable evidence shows that the drug is the subject of an ongoing Phase I or Phase II clinical trial or is the subject of the research study, investigational or other arm of an ongoing Phase III clinical trial or is the otherwise understudy to determine its maximum tolerated. That's not true. It is. It is. That is true. The fourth is also true, that it is reliable evidence shows that it is to determine the maximum tolerated dose, which is exactly what even Dr. Savelli, who children's hospital, I believe, was the treating physician, even notes in her letter that that's part of what they were trying to determine in this study was that can we use it into what dose can we do. So when you look at the plan, three of the four factors that the plan was supposed to look at to determine whether this was experimental or not apply in this case, and that is even on the face of the informed consent. What about the argument about the appeal process and the looking to professionals and whether that reached the plan administrator? What's your take on that? It is true that the two all-med health care professionals' opinions were not rendered until after the plan itself made the initial denial, which I believe was at the end of October. And I believe the two physicians. So that's the initial denial. That was the initial denial. Appeal. Yes. And then, well, are we talking about the parents' initial appeal or are we talking about children's appeal, which happened in 2010? In the 2010 appeal, after the insurance rights were assigned, the benefit of looking from that perspective was you did have the two health care professionals' opinions in the record to be reviewed at that time, plus Dr. Civelli's letter. So I think looking at the overall course of was the correct decision made and did children's health care appeal on behalf of the parents. You lost me in terms of there being two appeals and you said by the parents. But when I'd asked you earlier about are the parents really involved in this, you said it was all assigned. So help me if I'm not hearing you right. There was an initial assignment of medical payments for the benefits. And Children's Hospital attempted to assert that in early 2010 and tried to file an appeal on that. At that time, the anti-assignment provision was brought up. And then again in August, the parents specifically assigned their insurance appeal rights. And that's when there was another formal, we'll call it a formal appeal. And at that time, that resulted in the October 2010 final determination that there was no coverage for this. So at that time, the record as it existed consisted of the informed consent, the medical records. It also consisted of the two all-med physicians' opinions. It also consisted of Dr. Sue. Those are the two that they say never reached Judy Miles. That is correct. So when the ultimate appeal was decided and reviewed and there was a decision made whether we should ultimately cover this, everything that was in the record was already in the record. You're saying that as of October of 2010, a final decision was made. And at that point, the record had everything. And that record was in the possession of the plan administrator? Yes. And as the district court noted that, if there was an issue, what additional evidence would be needed? And some was presented as part of the supplemental record. And the district court noted that to no avail. Would that overcome? Let me ask you this about the conflict. Yes. Because I'd asked your adversary about his best quote. At 177 of the administrative record is the email from Turney saying, if you want us to cover the treatment, we can do it, but I cannot guarantee that the stop-loss carrier will accept the risk. Is that the best on their side as far as, you know, well, you can do it, but it's going to fall back on your head? I believe that it is and that perhaps smacking in the face of the plan that, look, if you're going to cover this, you're going to cover this on your own. Well, it doesn't say that. It says we can't guarantee it. Your adversary used words like it's likely or unlikely, which is different yet further from we won't do it. But is that probably the best language I'll ask them? I think that is the best language, and that's the best evidence. But, again, when we look at the factors, just because there's a conflict doesn't mean that the right decision was made. And the Supreme Court has held that a conflict of interest should prove more important where circumstances suggest that, you know, where you have a history of biased claims administration. But, again, it shouldn't overrule what the plan exactly says. And as we've gone through the informed consent and the exceptions to that, it's clear that this is part of the experimental arm and that that is the critical question in this case aside from the standing issue, which we believe precludes Children's Hospital from even being here in the first place. Just to go back to that, at least at this point, your position appears to be that if the parents are on the hook, there's no barrier to their raising the claim. There's not a res judicata aspect. There's no barrier to the parents raising the claim and seeking benefits. Well, to the extent that the issue has been argued, and it's been effectively argued in this case, I could see the argument that the parents might have an ability to come back and try again. But I'm not fully prepared to answer that question, Your Honor. We believe that this decision should be affirmed, and primarily, even though the district court did not rule on this, that this court should answer the question that was left implied in the Riverview Health v. Medical Mutual case and that is an anti-assignment provision in an ERISA plan is enforceable, joining the 1st, 11th, 10th, and 9th circuits. Thank you, Your Honor.  Thank you, Your Honor. First, the argument was made that the parents appealed this decision. If so, where was the ruling? The administrative record reflects no indication that any such ruling was made upon an appeal filed by the parents. In fact, the trial court also found that the parents had filed an appeal. But again, no ruling was made. This, in and of itself, is arbitrary and capricious. Furthermore, with regard to the statement about the parents' liability, at Administrative Records 1649 through 1652, there appear documents titled, Explanation of Benefits. These are the documents that were sent to the child's mother. The court may want to review them because they indicate that the parents are liable for the charges. That's something from the plan. I think I was going to ask in terms of the assignment, does the assignment say anything one way or the other? I mean, a lot of times you take an assignment exactly, you know, you assign something to somebody else exactly so you are off the hook. You're giving them something they wouldn't have otherwise and you want to get something for it. But I haven't read those documents. Why does the hospital take the assignment? Why are the parents willing to give it? I can't speak for the parents, but the hospital takes the assignment so that it can independently pursue the remedies, even though the parents retain those rights. You don't have a, at the moment, you're not willing to give an opinion as to what the assignment clause says as to the parents' liability? I believe that the assignment clause says that the parents are liable for anything not covered by a third-party payer. However, the letter referenced from Mr. Blomstrom to the plan, I don't believe made any reference to the expert medical opinions. The decisions rendered by the plan make no reference to expert medical opinions. There, in fact, is no reference in the administrative record to the effect that those opinions were ever delivered to the plan. So you're contradicting the statement that as of October 2010, there was an appeal record and these were in that record? Our reading of the administrative record was that while the expert medical opinions were in the administrative record, they were never in the possession of the plan. So the plan decided it on a record that was not in their possession? Arguably, the plan decided in its decision, it indicated that the basis for the denial, the sole basis, was the definition of the term experimental and or investigational. I have one or two things. When in the process of deciding on coverage here did the letter from counsel to the plan administrator come? When did that? The counsel here says their firm wrote a letter to I suppose the plan administrator or to the company saying you're not liable for this entire amount. You're not liable for the $250,000 or any part of it on the first trip. When did that occur in the process? I apologize, Your Honor. I don't have the date in front of me. But it was before the formal denial, was it not? I mean it was while there was this back and forth between Turney and Miles and Miles says we're getting another opinion and then Blomstrom comes in I think fairly soon after that before the process wraps up. Isn't that about right? Before the final decision is made. I'm not sure. Before the decision denying it was in an email dated November 16, 2009. I apologize. Significant to me. Most clients follow the advice of their counsel whom they're paying to give them legal advice and if you get a letter saying you're not liable for this, that usually is a significant factor in the process of decision making. Correct. Although notably, if that was the case, it would have occurred before the expert medical opinions were rendered. Yeah. Okay. Counsel, the one other thing is, same question I asked to the other side about the best evidence about what's going to happen with the stop-loss carrier. I was quoting the email that says, I cannot guarantee that the stop-loss carrier will accept the risk. Do you point to anything stronger than that or is that the? No. That is it. Administrative record 1626. Isn't there some statement by her that normally this kind of is not paid? There was a statement to the effect that in. All that gets not paid, something. Correct. There was a statement to the effect that in 99% of these cases, these claims, these children go into experimental treatment and these claims are not paid. I don't know exactly what this means, but there is an email from Stephanie Turney to Judy Miles apparently on November the 11th, 2009, that says it is our policy to deny all related coverage. Should you want us to cover all treatment with the exception of the chemotherapy drugs, then we can do so and so on. It seems to be a statement that it's the policy to deny the coverage. Right? Correct. It doesn't mean that, but that's what it says. But when read together with the other statement that in 99% of the cases, these types of treatments are denied, that in effect says we're never going to pay these. We're never going to authorize these. Okay. What's the 99%? Is that from another email? That was another email. I don't have that. We can find it, counsel. All right. Thank you. The case will be submitted. The remaining case will be submitted on briefs.